1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TONY A. CASTLEMAN,

11              Petitioner,              No. CIV S-09-CV-1887 FCD CHS P

12        vs.

13   STEVE MOORE,

14              Respondent.           FINDINGS AND RECOMMENDATIONS

15   _____/

16                          **I.  INTRODUCTION**

17         Petitioner, Tony A. Castleman, is a state prisoner proceeding *pro se* with a petition

18   for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.   Petitioner is currently serving an

19   indeterminate sentence of fifteen years to life following his 1986 conviction in San Diego County

20   Superior Court for second degree murder.   Here, Petitioner does not challenge the constitutionality

21   of that conviction, but rather, the execution of his sentence, and specifically, the January 18, 2008

22   decision by the Board of Parole Hearings (the "Board") finding him unsuitable for parole.

23                        **II.  CLAIMS FOR REVIEW**

24         Petitioner sets forth two grounds for relief in his pending petition.   Specifically,

25   Petitioner's claims are as follows:

26              (1)      The Board's determination that Petitioner remained

                                         1

1    unsuitable for parole is not supported by any evidence in
     the record, thus violating Petitioner's right to Due Process.

2

(2)    The last reasoned decision by the California Court of
3          Appeals upholding the Board's parole denial was based on
           an unreasonable determination of the facts, and was
4          contrary to and an unreasonable application of clearly
           established federal law, in violation of Petitioner's right to
5          Due Process.

6          Upon careful consideration of the record and applicable law, it is recommended

7    that this petition for writ of *habeas corpus* relief be denied.

8                              **III.  FACTUAL BACKGROUND**

9          The basic facts of Petitioner's commitment crime were summarized by the Presiding

10   Commissioner at Petitioner's parole hearing as follows:

11         On July 6, 1986 at approximately 11:55 a.m., police responded to a
           report received from a citizen that he had found something suspicious
12         at Marion [] Bar [] Park, in San Clemente Canyon near Genesee []
           and Highway 52.  The responding officer investigated the area, found
13         a bloody bed sheet and a blanket, and pulled up what appeared to be
           a large wad of human hair.  The area had a[n] odor of decomposing
14         flesh, and approximately 70 yards way down an embankment from
           the freeway, the body of the victim, Deborah [] Lynn [] Huerta [] was
15         found in a plastic bag.  On July 6, police received a telephone call
           from a witness by the name of Dudley O'Neal.  O'Neal stated he
16         knew who had committed the murder of Deborah Lynn Huerta, and
           that McEachern, [] [Petitioner's co-defendant,] had told him how the
17         killing took place.  O'Neal subsequently made a statement to police,
           and also testified at the preliminary examination.  Essentially, O'Neal
18         reported the following: McEachern told O'Neal that the victim had
           angered him [sic], so McEachern and [Petitioner] decided to scare
19         her.  McEachern, [Petitioner] and the victim drove into the San
           Clemente Canyon, and McEachern told the victim that this would be
20         the last place she would ever see.  At one point, [Petitioner] took the
           pickup truck and went to get some beer.  When [Petitioner] returned
21         with the beer, he left the doors to the pickup unlocked, and the
           windows open.  The victim was able to make a dash for the pickup
22         truck, get in, roll up the windows, lock the door, and attempted to
           drive away, but McEachern told [Petitioner] to break the windows to
23         stop her. [Petitioner] then took a baseball bat and broke the window.
           McEachern then pulled the victim from the truck, and during the
24         struggle the victim was fighting, kicking and screaming.  McEachern
           told [Petitioner] to help hold the victim's legs while he straddled
25         the victim.  McEachern got [Petitioner's] knife unsheathed, and stabbed
           the victim in the chest.  The autopsy report revealed that the cause of
26         death was multiple stab wounds in the chest, causing lacerations of

                                        2

the heart.  On July 9, McEachern and [Petitioner] were arrested for the murder of Deborah Lynn Huerta.  A version from [Petitioner] in the same report states that he and McEachern had dug a hold at San Clemente Canyon, and had taken the victim to show her a grave to scare her at approximately 9:00 p.m. [Petitioner] stated he left to get some beer, and when he returned, he left the truck doors unlocked with the keys inside. [Petitioner] explained that the victim got into the truck, rolled up the windows, and started to drive away. [Petitioner] stated he broke the driver's side window with a baseball bat, and that McEachern pulled the victim out [of] the truck and [he] was told to grab the victim's legs.  Castleman said McEachern must have grabbed the knife at his side, but he did not see McEachern stab the victim at first, however, [he] saw her go limp and heard the stabbing and the victim gurgling. [Petitioner] freaked out, jumped up, and didn't know what was going to happen, and then started to get sick. [Petitioner] said McEachern scared him, as he told him that he had killed someone before, and McEachern stated he was now an accessory, so he needed to help take care of the situation. [Petitioner] stated that on July 4, McEachern, O'Neal and himself intended to take the body into the mountains and bury it; however, the truck broke down the embankment along the freeway.  The following day, [Petitioner] had refused to answer the telephone until McEachern eventually contacted him and told him that he was fucking up, and that he needed to finish the job. [Petitioner] agreed to help, so they returned to the body and attempted to dig a second grave. [Petitioner] and O'Neal had a discussion about how they were both afraid of McEachern.  They were unable to move the body because the bag had broke [sic], and [Petitioner] finally told McEachern he didn't want to help anymore, and they all left the area.

(Pet. Ex. C at 12-15, Tr. of Petitioner's Parole Hr'g, Jan. 18, 2008).

Following a jury trial, Petitioner was convicted of second degree murder and was sentenced to fifteen years to life in prison.  Petitioner was received into the Department of Corrections on May 14, 1986.  Petitioner's minimum eligible parole release date passed on December 14, 1994 and since then, he has petitioned the Board of Parole Hearings for release on numerous occasions.  On January 18, 2008, Petitioner appeared before the Board for his seventh subsequent parole suitability hearing.  After considering numerous positive and negative suitability factors, the panel concluded that Petitioner remained an unreasonable risk of danger to society, and thus he was not suitable for parole.  Petitioner sought *habeas corpus* relief in the San Diego County Superior Court.  On July 18, 2008, the court denied his petition, finding that the Board's determination that petitioner was unsuitable for parole was supported by some evidence in the

record.  Petitioner next sought relief in the state appellate court.  The California Court of Appeal for the Fourth Appellate District denied the petition on November 25, 2008, also finding some evidence in the record supported the Board's decision.  Petitioner then sought relief in the California Supreme Court, where his petition was denied without comment on June 10, 2009.  Petitioner filed this federal petition for writ of *habeas corpus* on July 10, 2009.  Respondent filed an answer on March 12, 2010, and Petitioner filed his traverse on March 24, 2010.

## IV.  APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

This case is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of *habeas corpus* filed after its enactment on April 24, 1996.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997).  Under AEDPA, an application for a writ of habeas corpus by a person in custody under the judgment of a state court may be granted only for violations of the federal Constitution or laws of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 n. 7 (2000).  Federal *habeas corpus* relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

## V.  DISCUSSION

### A.    Due Process

Petitioner contends in two separate but related claims that his federal right to due process of law was violated by the Board's 2008 determination that he was not suitable for parole.  First, Petitioner claims that the Board's decision was not supported by any evidence in the record,

in violation of his federal right to due process of law.  Petitioner's second claim is that the last reasoned decision denying his state *habeas corpus* petition by the California Court of Appeals, Fourth Appellate District, was based on an unreasonable determination of the facts and was both contrary to and an unreasonable application of clearly established federal law, also in violation of his federal right to due process of law.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits state action that "deprive[s] a person of life, liberty or property without due process of law." U.S. CONST. AMEND. XIV, § 2.  A person alleging a due process violation must first demonstrate that he or she was deprived of a protected liberty or property interest, and then show that the procedures attendant upon the deprivation were not constitutionally sufficient.  *Ky. Dep't. Of Corrs. v. Thompson*, 490 U.S. 454, 459-60 (1989); *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002).  A protected liberty interest may arise from either the Due Process Clause itself or from state laws.  *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987).   In the context of parole, the United States Constitution does not, in and of itself, create a protected liberty interest in the receipt of a parole date, even one that has already been set.  *Jago v. Van Curen*, 454 U.S. 14, 17-21 (1981). However, when a state, such as California, elects to use mandatory language in its statutory parole scheme, it "'creates a presumption that parole release will be granted' when or unless certain designated findings are made, thereby giving rise to a constitutional liberty interest." *McQuillan*, 306 F.3d at 901 (quoting *Greenholtz v. Inmates of Neb. Penal*, 442 U.S. 1, 12 (1979)).

Under California state law, prisoners serving indeterminate prison sentences "may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement." *In re Dannenberg*, 34 Cal.4th 1061, 1078 (2005).  Generally, one year prior to an inmate's minimum eligible parole release date, the Board will conduct a hearing to determine that inmate's parole release date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." *In re Lawrence*, 44 Cal. 4th 1181, 1202 (2008) (citing CAL. PENAL CODE § 3041(a)).   The Board is instructed by statute to "set a

release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration . . . ." CAL. PENAL CODE § 3041(b). California state prisoners who have been sentenced to prison with the possibility of parole, therefore, have a clearly established, constitutionally protected liberty interest in the receipt of a parole release date. *Allen*, 482 U.S. at 377-78 (quoting *Greenholtz v Inmates of Neb. Penal*, 442 U.S. 1, 12 (1979)); *Irons v. Carey*, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th Cir. 2006)); *Biggs v. Terhune*, 334 F.3d 910, 914 (9th Cir. 2003); *McQuillion*, 306 F.3d at 903.

During a parole suitability hearing, it is well established that inmates are not guaranteed the "full panoply of rights" normally afforded to criminal defendants under the Due Process Clause. *See Pedro v. Or. Parole Bd.*, 825 F.2d 1396, 1398-99 (9th Cir. 1987). Nonetheless, inmates are afforded limited procedural protections. The Supreme Court has held that a parole board, at minimum, must give an inmate an opportunity to be heard and a decision informing him of the reasons he did not qualify for parole. *Hayward v. Marshall*, 603 F.3d 546, 560 (9th Cir. 2010) (citing *Greenholtz*, 442 U.S. at 16). In addition, as a matter of state constitutional law, denial of parole to a California inmate must be supported by "some evidence" demonstrating that the inmate poses an unreasonable risk of danger to society. *Hayward v. Marshall*, 603 F.3d 546, at 562 (citing *In re Rosencrantz*, 29 Cal.4th 616, 128 (2002)). *See also In re Lawrence*, 44 Cal.4th at 1191 (recognizing the denial of parole must be supported by "some evidence" that an inmate "poses a current risk to public safety"); *In re Shaputis*, 44 Cal.4th 1241, 1254 (2008) (same). "California's 'some evidence' requirement is a component of the liberty interest created by the parole system of [the] state," *Cooke v. Solis*, 606 F.3d 1206, 1213 (9th Cir. 2010), making compliance with this evidentiary standard mandated by the federal Due Process Clause. *Pearson v. Muntz*, 606 F.3d 606, 609 (9th Cir. 2010). Petitioner was thus entitled to an opportunity to be heard during his parole hearing, a decision supported by "some evidence" that he remained a current risk to public safety,

1  and to be informed of the reasons he did not qualify for parole.

2          The analysis of whether a California parole board's suitability decision was supported

3  by "[some evidence] is framed by the [state's] statutes and regulations governing parole suitability

4  determinations . . . ." *Irons*, 505 F.3d at 851.  A federal court undertaking review of a  "California

5  judicial decision approving . . . [the Board's] decision rejecting parole" must determine whether the

6  state court's decision "was an 'unreasonable application' of the California 'some evidence'

7  requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'"

8  *Hayward*, 603 F.3d at 562-63 (quoting 28 U.S.C. § 2254(d)(2)).  Accordingly, this court must "look

9  to California law to determine the findings that are necessary to deem [a petitioner] unsuitable for

10 parole, and then must review the record to determine whether the state court decision holding that

11 these findings were supported by 'some evidence' [] constituted an unreasonable application of the

12 'some evidence' principle." *Irons*, 505 F.3d at 851.

13         Title 15, Section 2402 of the California Code of Regulations sets forth various factors

14 to be considered by the Board in making its parole suitability findings for inmates convicted of

15 murder.  The regulation is designed to guide the Board's determination of whether the inmate would

16 pose an "unreasonable risk of danger to society if released from prison," and, thus, whether he or

17 she is suitable for parole.  *In re Lawrence*, 44 Cal.4th at 1202.  The Board is directed to consider all

18 relevant and reliable information available, including

19             the circumstances of the prisoner's: social history; past and present
              mental state; past criminal history, including involvement in other
20            criminal misconduct which is reliably documented; the base and other
              commitment offenses, including behavior before, during and after the
21            crime; past and present attitude toward the crime; any conditions of
              treatment or control, including the use of special conditions under
22            which the prisoner may safely be released to the community; and any
              other information which bears on the prisoner's suitability for release.
23            Circumstances which taken alone may not firmly establish
              unsuitability for parole may contribute to a pattern which results in
24            a finding of unsuitability.

25 15 CAL. CODE REGS. § 2402(b).  In addition, the regulation lists nine specific circumstances tending

26 to demonstrate suitability for parole and six specific circumstances tending to demonstrate

7

unsuitability for parole:

(c) Circumstances Tending to Show Unsuitability.  The following circumstances each tend to indicate unsuitability for release.  These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate unsuitability include:

(1) Commitment Offense.   The prisoner committed the offense in an especially heinous, atrocious or cruel manner...

(2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable social history.  The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems relating to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability.  The following circumstances each tend to show that the prisoner is suitable for release.  The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel.  Circumstances tending to indicate suitability include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime

8

as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for the Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

15 CAL. CODE REGS. § 2402(c) & (d).

The overriding concern is public safety, *In re Dannenberg*, 34 Cal.4th at 1086, and the focus of the inquiry is on the inmate's current dangerousness.  *In re Lawrence*, 44 Cal.4th at 1205.  Accordingly, under California law, the standard of review is not whether some evidence supports the reasons cited for denying parole, but whether some evidence indicates that an inmate's release would unreasonably endanger public safety.  *In re Shaputis*, 44 Cal.4th at 1254.  Therefore, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public."  *In re Lawrence*, 44 Cal4th at 1212.  In other words, there must be a rational nexus between the facts relied upon and the ultimate conclusion that the prisoner continues to be a threat to public safety.  *Id*. at 1227.

### 1.    Sufficiency of Evidence

Petitioner's first claim is that the Board's determination that he remained unsuitable for parole was not supported by any evidence in the record, thus violating his due process rights. In support of this claim, Petitioner alleges that the Board failed to follow applicable laws, policies,

9

1   procedures, and regulations, including the California Code of Regulations, California Administrative

2   Law, the California Penal Code, and both the California and United States Constitutions.  Moreover,

3   Petitioner contends that because the Board's decision is unsupported by any evidence, the Board has

4   merely "acted to endorse the Governor's underground 'no-parole' policy."  (Pet. at 5B.)

5   In this case, the record reflects that the Board conducted Petitioner's suitability

6   hearing interactively with him, discussing his criminal, social and family history, his attitude

7   towards the commitment offense, his institutional disciplinary record, his personal progress since

8   becoming incarcerated, his history of drug and alcohol use and treatment, his psychological

9   evaluation, his post-incarceration plans for employment and residence, and letters of support from

10  family members.  Although many applicable regulatory criteria tended to indicate that Petitioner was

11  suitable for parole, the Board's decision to deny parole did not violate his right to due process

12  because it is supported by "some evidence."[1]

13  Petitioner was born in 1963 and was 44 years of age at the time of his January 2008

14  parole suitability hearing.  He grew up in San Diego, California, where he dropped out of Claremont

15  High School after completing the eleventh grade.  He eventually moved to Colorado for almost a

16  full year, where he obtained his GED before returning to San Diego.  Petitioner has no juvenile

17  criminal record, and his criminal record as an adult, aside from the commitment offense, consists

18  solely of a failure to appear for a traffic case.  Petitioner admits previous use of controlled

19  substances, spanning the time period from approximately age fifteen until age twenty.  He also

20  describes himself as a former alcoholic, though he does not subscribe to the principle of Alcoholics

21  Anonymous ("AA") that an individual who has suffered from alcoholism in the past is forever an

22

23  [1] In his traverse, Petitioner informs the court that he was, in fact, found suitable for parole

24  at his next subsequent parole hearing.  To the extent that he claims that the Board's subsequent
    determination of suitability should be considered on federal *habeas corpus* review as evidence that

25  he was suitable for parole at the time of the parole denial challenged herein, his claim is without
    merit.  This court may only consider evidence before the Board at the time of the January 18, 2008

26  hearing, thus any evidence bearing on Petitioner's parole suitability developed subsequently to that
    hearing is irrelevant to Petitioner's current petition for writ of *habeas corpus*.

alcoholic.

Since entering prison in 1986, Petitioner has availed himself of available, relevant self-help programming within the institution.  At the time of his hearing, the Board recognized Petitioner's completion of several self-help courses, including "the Four Agreements," "Communications and Interpersonal Relationships," "Stress Management," and "the Forgiveness." In addition to institutional programming, Petitioner has undertaken self-help on his own initiative, mainly through reading.  At his hearing, Petitioner presented the Board with reports he wrote on six books he had read since his last appearance before the Board, including "Chemical Dependency," "Invisible Wounds: Crime Victims Speak," "Post-Trauma Stress," "Forgiveness," "The Four Agreements," and "Post-Traumatic Stress: A Critical Incident Stress Book."  The book reports detailed Petitioner's thoughts on the books as they related to, *inter alia*, his commitment offense and its effect on his family, the victim's family, himself, and his rehabilitation.  Regarding one of the books, Petitioner noted that "[w]hen a crime is committed, it is clear to me that suffering occurs at all levels and to everyone involved."  (Pet. Ex. C at 41.)

Petitioner began attending Alcoholics Anonymous ("AA") upon becoming incarcerated, but he discontinued his participation from 1993-2004.  Although Petitioner does not believe in the majority of the AA "steps," he nonetheless resumed participation in the program in 2005 because he felt that it was helpful to his rehabilitation and his long-term goal of sobriety.  Also in 2005, Petitioner began following the tenets of Asatru, a nature-based Northern European religion emphasizing the virtues of, *inter alia*, perseverance, hard work, and hospitality.  One explanation Petitioner gave for his disagreement with several of the AA "steps" was that Asatru emphasized personal responsibility, as opposed to several of the AA "steps," which he felt asked him to turn his will over to God or a higher power.  Petitioner had, however, begun a "moral inventory," and was undertaking what he considered to be a continuous task of making apologies to people that he felt he had wronged.  Petitioner also explained to the Board that, unlike in his past, his current method of dealing with stress was to turn to his many supportive family members and to his religion.

Petitioner has gained significant marketable work experience while incarcerated. Indeed, Petitioner has participated in the Prison Industry Authority ("PIA") Job Referral Program since he entered the California Department of Corrections in 1986.  Through PIA, Petitioner has obtained certificates in Warehouse and Upholstery; Material Distribution Product; Packing, Stocking and Inventory Training; Forklift Operation; and Registered Customer Service Specialist.  He also passed the Electronic Technicians Association's Exam, and obtained other unnamed certificates. He has received numerous laudatory "chronos" from his work supervisors, all indicating his work performance was above average, and most of them noting his work performance to be exceptional. Petitioner produced evidence of realistic parole plans, including multiple job opportunities.  He also produced letters from many family members, all of whom indicated a willingness to help Petitioner get back on his feet and to be successful outside the confines of the prison environment.

Petitioner's most recent psychological evaluation estimated that he posed a "low" risk of future dangerousness to the community.  Moreover, the evaluator indicated that Petitioner described the commitment offense in agreement with available documentation, and that he accepted personal responsibility for his participation in the murder of the victim, Deborah Huerta, and has consistently expressed remorse for his actions.

Thus, Petitioner has no juvenile record, 15 CAL. CODE REGS. § 2402(d)(1), no record of previous violence, 15 CAL. CODE REGS. § 2402(c)(2), no history of sadistic sexual offenses, 15 CAL. CODE REGS. § 2402(c)(4), and lacks any significant history of violent crime, aside from the commitment offense, 15 CAL. CODE REGS. § 2402 (d)(6).  There is no evidence that Petitioner has suffered from severe mental problems or that he has psychological problems that would bear on his suitability. 15 CAL. CODE REGS. § 2402(c)(5).  In fact, the Board considered Petitioner's most recent psychological evaluation to be "very good" and "very favorable."  (Pet. Ex. C at 73.)  While at the time of the commitment offense, Petitioner admits his relationship with some family members was somewhat tumultuous, by all accounts his relationship with his family is now quite positive and stable, and it appears that Petitioner has maintained continuous contact while incarcerated with many

1   family members, including his mother, stepfather, father, stepmother, uncle, and several stepsisters.

2   15 CAL. CODE REGS. § 2402(c)(3).  Petitioner's prison disciplinary record is minimal, with his last

3   serious "115"[2] disciplinary report incurred in 1994, fourteen years prior to the date of his parole

4   hearing.  15 CAL. CODE REGS. § 2402(c(6).  The psychological evaluator opined that Petitioner has

5   accepted responsibility for his role in the murder and has consistently expressed remorse for his

6   crime.  15 CAL. CODE REGS. § 2402(d)(3).  Petitioner has participated in activities in prison that

7   indicate an enhanced ability to function within the law upon release.  15 CAL. CODE REGS. §

8   2402(d)(9).  Petitioner has also developed marketable skills and made realistic plans for his release.

9   15 CAL. CODE REGS. § 2402(d)(9).  Nonetheless, the Board found that the positive factors

10  demonstrating Petitioner's suitability for parole did not outweigh the negative factors demonstrating

11  his unsuitability.

12          In determining that Petitioner was not yet suitable for parole, the Board relied in large

13  part on the facts and circumstances of Petitioner's commitment offense.  A prisoner's commitment

14  offense can be a parole unsuitability factor if it was committed in an especially heinous, atrocious

15  or cruel manner.  15 CAL. CODE REGS. § 2281(c)(1).  Under some circumstances, a prisoner's

16  commitment offense alone can constitute a valid basis for denying parole.  *In re Rosenkrantz*, 29

17  Cal.4th 616, 682 (2002).  Given the liberty interest that California prisoners possess in their release

18  on parole, however, the Ninth Circuit has cautioned that a continued reliance on an unchanging

19  factor, such as a prisoner's commitment offense or pre-incarceration conduct, to support a finding

20  of unsuitability for parole may, over time, constitute a violation of due process where there is

21  evidence of rehabilitation and the prisoner has served the minimum term on his sentence.  *Irons*, 505

22  F.3d at 852-53 (9th Cir. 2007).  Thus, in order for the circumstances of a commitment offense to

23  support the denial of parole, there must be "something in the prisoner's pre- or post-incarceration

24

25          [2] A 115 Rules Violation Report is a report documenting misconduct that is "believed to be
    a violation of law or that is not minor in nature."  15 CAL. CODE REGS. § 3312(a)(3).  By contrast,
26  a 128 is issued for misconduct that recurs after verbal counseling or where documentation of minor
    misconduct is needed.  *Id*.

1   history, or his or her current demeanor and mental state," that indicates "the implications regarding

2   the prisoner's dangerousness that derive from his or her commission of the commitment offense

3   remain probative to the statutory determination" of the prisoner's current or future dangerousness.

4   *See Cooke*, 606 F.3d at 1216 (quoting *In re Lawrence*, 44 Cal.4th 3d at 1214).

5          Under the applicable state regulations, factors relating to a commitment offense tend

6   to show unsuitability for parole where the offense was committed in an "especially heinous,

7   atrocious or cruel manner," such as (A) multiple victims were attacked, injured or killed; (B) the

8   offense was carried out in a dispassionate and calculated manner, such as an execution style murder;

9   (C) the victim was abused, defiled or mutilated; (D) the offense was carried out in a manner which

10  demonstrates an exceptionally callous disregard for human suffering; or (E) the motive for the crime

11  is inexplicable or very trivial in relation to the offense.  15 CAL. CODE REGS. § 2402(c)(1)(A)-(E).

12  Here, the Board determined that Petitioner's commitment offense fits the regulatory scheme for one

13  that was committed "in an especially heinous, atrocious or cruel manner."  15 CAL. CODE REGS. §

14  2402(c)(1), finding three of the above factors to be supported in the record.

15         Specifically, the Board found that the offense was committed in a very dispassionate

16  and calculated manner, 15 CAL. CODE REGS. § 2402(c)(1)(B),  in that it appeared to be well planned.

17  The Board noted that Petitioner and his crime partner lured the victim to a remote area where they

18  had already dug a grave.  There was evidence that during the commission of the crime, Petitioner,

19  who had been drinking that day, left his crime partner and the victim at the scene to purchase more

20  beer, and that upon his return, the victim attempted to escape.  Moreover, the victim was

21  "unceremoniously dumped at the scene," and there was evidence that Petitioner and his crime

22  partner later returned and attempted to move the body in an effort to conceal their actions.  (Pet. Ex.

23  C at 72.)

24         The Board also found that the offense was carried out in a cruel manner that

25  demonstrated an exceptionally callous disregard for human suffering, 15 CAL. CODE REGS. §

26  2402(c)(1)(D), explaining that the victim had been stabbed as many as eighteen times and died as

a result of those wounds.  Furthermore, the Board emphasized that the victim had been terrorized by Petitioner and his crime partner in that she tried to escape by running to a vehicle and successfully locking herself inside.  Upon instruction from his crime partner, Petitioner broke the vehicle's window with a baseball bat and his crime partner dragged the victim from the vehicle back to the grave site, where the evidence reflects Petitioner held the victim down while his crime partner repeatedly stabbed her.

Lastly, the Board cited Petitioner's motive for the offense, 15 CAL. CODE REGS. § 2402(E).  In order to fit the regulatory description for an inexplicable or very trivial offense, a prisoner's motive must have been *more* trivial than those which conventionally drive people to commit the offense in question.  *See In re Scott*, 119 Cal.App.4th 871, 893 (1st Dist. 2004) (*Scott I*) (reasoning that all motives for murder could reasonably be deemed "trivial").  The rationale behind this factor is that one whose motive is unintelligible or cannot be explained may be unusually unpredictable and dangerous.  *Id*.  Here, there was evidence in the record that the murder was committed because Petitioner's crime partner wanted to silence the victim in order to prevent her from testifying against him in a pending case.  Such retaliation in order to silence a potential witness's testimony is a trivial reason to brutally terrorize and kill someone.  Under the circumstances of this case, where Petitioner's conduct was so heinous, a conclusion that he may be unusually unpredictable and dangerous due to his trivial motive is not unreasonable.  While the commitment crime is indeed an immutable factor that Petitioner is forever unable to change, this is not a case where continued reliance on such a factor rises to the level of a due process violation.

In addition to the commitment offense, the Board considered Petitioner's history of substance abuse and his ten-year hiatus from self-help programming from 1993-2004.  The Board was particularly concerned with regard to Petitioner's discontinued participation in AA during that time period because alcohol played a significant role in the commitment offense.  Indeed, there was evidence in the record that Petitioner had drunk approximately fifteen beers on the day of the murder, and that he drank heavily for the three days following the murder.  In addition, although

1  Petitioner's institutional disciplinary record is minimal, it does reflect that he received two 115 Rules

2  Violation Reports in connection with possession and use of contraband substances, the first in 1987

3  for stimulants and sedatives, and the second in 1993 for meth.  Incidentally, his participation in AA

4  was curtailed around the same time he incurred the second 115 drug infraction.  When questioned

5  during his parole hearing as to why he had discontinued his participation in AA, Petitioner's only

6  explanation was that he was "[w]orking, [and] being immature" during that time period.  Although

7  Petitioner resumed his participation in AA in 2005, the Board concluded that, in light of his

8  substance abuse history and the role of alcohol in the commitment offense, his inconsistent

9  participation in self-help, particularly in the area of substance abuse, "would represent a red flag for

10  anyone that reviews [his] file."  (Pet. Ex. C at 72.)

11        As the Ninth Circuit has recognized, although "it would likely violate [a prisoner's]

12  First Amendment rights to require him to attend [a faith-based program such as] AA as a condition

13  of parole...[t]he California Department of Corrections is, of course, free to impose other parole

14  conditions relating to alcohol...." *Pirtle v. California Bd. Of Prison Terms*, 611 F.3d 1015, 1024 n.6

15  (2010).  Petitioner informed the board, however, that although he did not agree with many of the

16  tenets of AA, he found participation useful to maintaining his sobriety, and intended to continue

17  participation upon his release.  (Pet. Ex. C at 35.)  In addition, Petitioner informed the Board that

18  he was not attending AA simply because the Board desired that he do so, and the Board recognized

19  that Petitioner did not have to personally agree with the teachings of AA.  *Id*.  The Board also

20  recognized that Petitioner had recently undertaken self-help in the area of substance abuse by

21  independently reading several books related to substance abuse and by providing the Board with

22  written reports regarding what he had learned.  *Id*. At 39-41.

23        Given Petitioner's history of substance abuse, the role of alcohol in his commitment

24  offense, and the serious 115 Rules Violation Reports incurred by Petitioner for possession of

25  contraband substances while incarcerated, it cannot be said that the Board was unreasonable in its

26  determination that Petitioner's lack of consistent and continuous participation in self-help

16

programming for his alcohol issues was insufficient to support the Board's finding that Petitioner remained an unreasonable risk of danger to society. "The parole board...undeniably does have a legitimate penological interest in considering [parole candidates'] substance abuse backgrounds during the individualized inquiry for parole suitability." *Thompson v. Davis*, 295 F.3d 890, 898 n.4 (9th Cir. 2002). Here, the Board recognized that Petitioner would inevitably face unfamiliar stresses and pressures outside the prison system when paroled, and concluded that, at the time of the parole hearing, Petitioner had not adequately and continuously demonstrated his ability to effectively manage those stressors without reverting to drugs and alcohol. Moreover, while Petitioner's most recent psychological evaluation was considered to be favorable by the Board, the evaluator did note that Petitioner previously used alcohol "as a means of addressing underlying emotions for some time prior to his incarceration." (Pet. Ex. A at 7.) The evaluator went on to note that, although Petitioner appeared to understand his previous dependence on alcohol to address his emotions, "his sobriety has not yet been demonstrated in the free community and as such, the diagnosis of dependence with controlled setting remission remains appropriate." *Id*. Petitioner's substance abuse history and inconsistent self-help programming in the area of alcohol abuse thus provides "some evidence" in support the Board's decision to deny parole in consideration of public safety.

The Board next observed that Petitioner's history of misconduct while incarcerated was very limited. However, in addition to the two serious 115 Rules Violation Reports, discussed above, incurred by Petitioner during his incarceration, the Board noted that Petitioner had received an additional 115 in 1994 for participating in a work strike, as well as two less serious 128 Rules Violation Reports, the most recent being in April 2005 for being unruly and belligerent with a supervisor. A prisoner's institutional behavior can render him unsuitable for parole where he has engaged in serious misconduct while incarcerated. Although Petitioner's 115 infractions are remote, two of the infractions bear directly on Petitioner's substance abuse issues and are thus related to the underlying commitment offense, as discussed above. However, by definition, 128 disciplinary infractions are less serious, and the probative value of such an infraction committed three years prior

1   to the parole hearing towards Petitioner's current dangerousness is questionable.

2         Lastly, the Board noted that the San Diego County District Attorney opposed

3   Petitioner's release.  While opposition to release on parole by law enforcement based upon the

4   nature of a prisoner's commitment offense is insufficient on its own to support a parole board's

5   determination of unsuitability for parole, *Rosenkrantz v. Marshall*, 444 F.Supp.2d 1063, 1080 n.14

6   (C.D.Cal. 2006), such opposition may be properly considered in conjunction with other suitability

7   and unsuitability factors.  *See* 15 CAL. CODE REGS. § 2402(b) ("All relevant, reliable information

8   available to the panel shall be considered in determining suitability for parole.").  Here, the District

9   Attorney opposed release based on the gravity of the commitment offense, Petitioner's inconsistent

10  self-help programming, and variations between several of Petitioner's previous psychological

11  evaluations which, according to the District Attorney, demonstrated that it was too early determine

12  how Petitioner would be able to cope outside the confines of the prison environment.  (Pet. Ex. C

13  at 60-61.)

14        After considering the above factors, the Board reasonably determined that Petitioner

15  would pose an unreasonable risk of danger to society or a threat to public safety if released from

16  prison.  Applying the federal *habeas corpus* review standard applicable to parole denials for

17  California state prisoners, it appears that "some evidence" supports the Board's determination that

18  Petitioner was not suitable for parole at the time of his 2008 hearing.  The Board considered both

19  positive and negative factors bearing on parole suitability, but ultimately concluded that the

20  circumstances tending to demonstrate suitability for parole did not outweigh the circumstances

21  tending to demonstrate that Petitioner was not yet suitable for parole.  15 Cal. Code Regs. § 2402(b)-

22  (d).  The circumstances of Petitioner's commitment crime combined with his substance abuse

23  history, inconsistent self-help programming, specifically in the area of alcohol abuse, and his two

24  115 infractions for use or possession of contraband substances within the institution provide the

25  required modicum of evidence to support the Board's denial of parole.  As reviewed above, relevant

26  portions of the evidentiary record support the evidence cited by the Board in determining Petitioner

was unsuitable for parole, providing a rational nexus between that evidence cited and the Board's ultimate conclusion that Petitioner remained an unreasonable risk of danger to the public. In addition, all factors articulated by the Board as the basis for its decision are permissible considerations in parole suitability determinations under California law. 15 CAL. CODE REGS. § 2402(b)-(d). While another panel might have reached a different conclusion based on the evidence, a reviewing court may not re-weigh the evidence before the Board, nor may a reviewing court substitute its own judgment for that of the Board.

With regard to Petitioner's allegation that the Board or the Governor (or both) act either separately or in conjunction to enforce an underground "no parole" policy, this contention is without merit. Petitioner has failed to provide any facts in support of this allegation. On the contrary, Petitioner's claim is based on conclusory allegations, and should be rejected on that basis. *See Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("'Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.'" (quoting *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)).

The Board's decision withstands the minimally stringent "some evidence" standard. It is also clear from the record that Petitioner was given an opportunity to be heard during his parole hearing and was informed of the reasons for the Board's decision, thus satisfying federal due process. To the extent that Petitioner's claim rests on his allegation that the Board has violated California state law or procedure, it is not cognizable in a federal petition for writ of *habeas corpus* because such relief is unavailable for alleged error in the interpretation or application of state law. *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1986); *Givens v. Housewright*, 786, F.2d 1378, 1381 (9th Cir. 1986). A writ of *habeas corpus* is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. *Middleton*, 768 F.2d at 1085; *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983). Petitioner has received all process he was due and is thus not entitled to federal *habeas corpus* relief on his claim challenging the evidence supporting the Board's parole suitability determination.

1          ## 2.       The Last Reasoned Decision by the California Court of Appeals

2          Petitioner's second claim is that the last reasoned decision, which was issued by the

3   California Court of Appeals, upholding the Board's determination that he was unsuitable for parole

4   was based on an unreasonable determination of the facts, and was contrary to and an unreasonable

5   application of clearly established federal law.  Specifically, Petitioner alleges that his federal due

6   process rights were violated because he posed two questions to the state court that he contends were

7   left unanswered in the court's written opinion.[3]  According to Petitioner, instead of answering his

8   questions, the state court "merely cited Petitioner's pre-commitment record/history and disciplinary

9   violations that have no connection to Petitioner's risk level if released on parole."  (Pet. at 5D.)

10          As discussed above, this case is governed by the provisions of AEDPA, and thus the

11   pending petition may only be grated for violations of the Constitution or laws of the United States.

12   28 U.S.C. § 2254(a).  Moreover, federal *habeas corpus* relief is unavailable for any claim decided

13   on the merits in state court proceedings, unless the state's courts adjudication of the claim was

14   contrary to or an unreasonable application of clearly established federal law, or was based on an

15   unreasonable determination of the facts in light of the record.  Thus, AEDPA establishes a "highly

16   deferential standard for evaluating state-court rulings."  *Woodford v. Viscotti*, 537 U.S. 19, 24

17   (2002).  Accordingly, when determining whether the law applied to a particular claim by a state

18   court was contrary to or an unreasonable application of "clearly established federal law," a federal

19

20          [3] Petitioner's first question was whether "Due Process require[s] the Board to follow the rules
21   which are Administrative Law."  *Id*. at 5C.  This question has already been addressed in section (V),
    above, which extensively discusses the requirements of federal due process in the context of a parole
22   suitability hearing.

23   Next, Petitioner asks if "the State Court [is] required to ensure the rules which are Administrative
    Law] are followed when searching for Some Evidence to support the Board's decision. *Id*.  Again,
24   federal procedural due process requirements in the context of parole suitability hearings have been
    discussed extensively in section (V), above.  On federal *habeas corpus* review, this court is limited
25   to granting relief for violations of the Constitution or laws of the United States.  To the extent,
    therefore, that Petitioner alleges solely a violation of California state laws or procedures, his claim
26   is not cognizable for federal *habeas corpus* relief.  *Middleton*, 768 F.2d at 1085.

court must review the last reasoned state court decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004); *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Provided that the state court adjudicated the petitioner's claims on their merits, its decision is entitled to deference, no matter how brief.  *Lockyer*, 538 U.S. at 76; *Downs v. Hoyt*, 232 F.3d 1030, 1035 (9th Cir. 2000).

Here, the last reasoned decision on the merits of Petitioner's claim was issued by the California Court of Appeal, Fourth Appellate District.  The appellate court found that "some evidence" supported the Board's decision that Petitioner remained an unreasonable risk of danger to society and was thus not suitable for parole.  After examining the facts of Petitioner's commitment offense, (Pet. Ex. C at 1-2), the Board explained its reasoning as follows:

> Some evidence supports the Board's decision.  Petitioner has a history of drug and alcohol use and he drank 15 beers on the day of the murder, and at one point left to get more beer.  Petitioner agrees that alcohol was a big part of the commitment offense.  Moreover, petitioner's psychologist noted that "alcohol...does appear to be a significant factor in terms of past use and in the life crime."  The psychologist also stated the following: "[Petitioner] appears to have used substances, primarily alcohol, as a means of addressing underlying emotions for some time prior to his incarceration, and does appear to understand the role of these factors in his past substance abuse.  Nevertheless, his sobriety has not yet been demonstrated in the free community, and as such, the diagnosis of dependence with controlled setting remission remains appropriate."
>
> Despite the fact that alcohol was such an important causative factor of the offense, petitioner discontinued self-help for over a decade, from 1993-2004, in particular his participation in Alcoholics Anonymous.  The Board considered this a "red flag."  Petitioner's only explanation for discontinuing self-help was that he was working and "being immature."  Petitioner states that he has resumed participation in Alcoholics Anonymous, but he does not agree with a lot of it.  Although there is no requirement that petitioner take part in a particular program or agree with all of its tenets, due to the connection between the life crime and substance abuse, along with petitioner's failure for over a decade to complete self-help, without further rehabilitation petitioner is currently a threat to public safety.  (*In re Lawrence*, *supra*, 44 Ca.4th at p. 1220, fn. 19.)  Some evidence therefore supports the Board's denial of parole based on petitioner's self-help hiatus.
>
> Moreover, some evidence supports the Board's reliance on the commitment offense.  As recently explained by our Supreme Court:

"In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1228.)

In addition to petitioner's rehabilitation hiatus, he has also engaged in criminal conduct postincarceration.  Petitioner's serious rules violations include a work strike in 1994, and more troubling, two substance abuse related violations, one for possession of methamphetamine in 1993, and another for possession of stimulants and sedatives in 1987.  Thus, the Board could rely on the commitment offense, as well as petitioner's prior misconduct, and there is some evidence to support its decision. (*In re Lawrence*, *supra*, 44 Cal.4th at p. 1228.)  We therefore conclude the Board properly found petitioner unsuitable for parole and petitioner's due process rights have not been violated.

(Pet. Ex. C at 3-5.)

While it is true that continuing reliance on unchanging factors in the absence of other evidence of current dangerousness may rise to the level of a due process violation, however Petitioner provides no authority in support of his contention that his commitment offense, institutional misconduct, or pre-commitment record and history bear no relationship to the Board's determination that he remained an unreasonable risk of danger to society and was thus unsuitable for parole at the time of his 2008 hearing.  Indeed, conclusory allegations "fall far short of stating a valid constitutional violation."  *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 2004).  Moreover, as discussed in section (V), above, these factors are proper considerations under the applicable statutory scheme governing parole suitability determinations, and these factors provide "some evidence" in support of the Board's determination that Petitioner was unsuitable for parole because he posed a current risk of dangerousness to society.

Furthermore, because AEDPA establishes a highly deferential standard for the evaluation of a state-court ruling, a federal court considering a petitioner's federal *habeas corpus* petition must defer to the last reasoned state-court decision on the merits of a petitioner's claim.

1    Here, the California Court of Appeal determined that the Board considered the gravity of the facts

2    and circumstances of Petitioner's commitment offense, Petitioner's hiatus from self-help

3    programming, particularly Alcoholics Anonymous, from 1993-2004, and Petitioner's institutional

4    misconduct, although limited, supplied "some evidence" in support of the Board's determination that

5    Petitioner remained an unreasonable risk of danger to society and was unsuitable for parole.

6    Petitioner has failed to demonstrate that the decision reached by California Court of Appeals is

7    contrary to or an unreasonable application of clearly established federal law, or that the decision was

8    based on an unreasonable determination of the facts.  Petitioner is not entitled to federal *habeas*

9    *corpus* relief on this claim.

## VI.  CONCLUSION

11            Accordingly, IT IS RECOMMENDED that Petitioner's petition for writ of *habeas*

12   *corpus* be denied.  These findings and recommendations are submitted to the United States District

13   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

14   days after being served with these findings and recommendations, any party may file written

15   objections with the court and serve a copy on all parties.  Such a document should be captioned

16   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17   shall be served and filed within seven days after service of the objections.  Failure to file objections

18   within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*,

19   158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In any

20   objections he elects to file petitioner may address whether a certificate of appealability should issue

21   in the event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

22   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

23   when it enters a final order adverse to the applicant).

24   DATED: October 12, 2010

25   *Charlene H. Sorrentino*

26   CHARLENE H. SORRENTINO
     UNITED STATES MAGISTRATE JUDGE

                                                    23